294 P.2d 677

**STATE of Arizona, Appellee,**

v.

**Richard Lewis JORDAN, Appellant.**

No. 1071.

Supreme Court of Arizona.

March 13, 1956.

Clifton E. Bloom and Fred W. Fickett, Tucson, for appellant.

Robert Morrison, Atty. Gen., and L. Alton Riggs, Sp. Asst. to the Atty. Gen., for appellee.

WINDES, Justice.

Defendant Richard Lewis Jordan appeals from judgment finding him guilty of mur-

der in the first degree and sentencing him to death.

On May 24, 1954, in the early evening, defendant visited the Club Esquire, a night club in Tucson, Arizona and at that time was introduced to one Phyllis Mae Thompson who had stopped at the Club to deliver a message to the manager. After about an hour, during which time defendant drank some beer and Miss Thompson a soft drink, they left the Club Esquire together and went to the Tropical Inn, also a night club in Tucson. Here defendant again drank some beer and Miss Thompson had a soft drink. At about 11:00 o'clock p. m. they returned to the Club Esquire for a short time and then went back to the Tropical Inn. They left the Tropical Inn around one o'clock on the morning of May 25th.

About 4:30 o'clock in the afternoon of May 25th, the body of Phyllis Mae Thompson was found in the desert approximately six or seven miles from Tucson. The body was approximately 50 to 60 feet from the road and was completely disrobed except for the right shoe. There were 16 stab wounds in the chest area, four of which had penetrated the heart. Her face was mutilated by a number of knife incisions. Miss Thompson's clothing was found approximately 600 feet from the body.

Defendant was charged with the first degree murder of decedent. He pleaded not guilty and thereafter filed a notice of intent to make a defense of insanity at the time of the alleged commission of the offense charged; and also, a defense of alibi. Upon trial, the jury found the defendant guilty of murder in the first degree and fixed the penalty of death. From judgment and sentence entered upon this verdict and from order denying motion for new trial defendant appeals.

There are 23 assignments of error, 19 of which are that the county attorney made improper and prejudicial argument to the jury and the court erred in not instructing the jury to disregard the same. The other assignments are claimed error of the trial court in admitting evidence over defendant's objections.

In his address to the jury the prosecutor in persuading the jury to inflict the death penalty stated:

"I could be mercernary and talk to you about the finances of it. I don't think that has got any place in it but it must take five thousand dollars a year to maintain a prisoner up there. I may take twice that or half of that. If it takes five thousand dollars a year to guard him and feed him and take care of him, he has got a life expectancy of forty or fifty years, the taxpayers of Arizona are going to have to pay a quarter of a million dollars for the luxury of keeping him alive when he has done what he did and we can never again trust him outside the prison walls."

Such argument is clearly indefensible as a reason for the infliction of the extreme penalty. The jury is given the discretion in such cases to impose life imprisonment or death, but such discretion must be based upon legitimate reasons and the expense of "keeping him alive" is not a legitimate reason. The statement even goes further and assumes a fact not in evidence and which could not have been put in evidence, that it would probably cost the state five thousand dollars a year or an aggregate of about a quarter of a million dollars. As was well stated in Commonwealth v. Clark, 322 Pa. 321, 185 A. 764, 766:

> "We have not reached the stage where men should be sent to the electric chair in order to avoid the expense of keeping them in the penitentiary. The defendant was on trial for his life and should not have had his cause prejudiced by intemperate remarks calculated to prejudice the jury and warp their judgment by the thought of the expense to the commonwealth which would affect them as taxpayers."

Also, the county attorney said:

> "Maybe you can wonder why or appreciate why perhaps Mr. Thompson and some of the other people in the case think maybe the death penalty is too good for him, think maybe he ought to suffer the way she suffered."

This statement also injected in the minds of the jurors matters with which they should not be concerned in deciding the penalty. What a relative of the decedent or other people might think the penalty should be is not a matter to be considered. The jury exercises the discretion from the nature and gravity of the crime as disclosed by the legitimate evidence. The opinions of relatives and other people not members of the jury are not factors which the jury is entitled to consider in the rendition of its judgment imposing the penalty of execution. As in the first mentioned statement, there was not and could not be any evidence of these opinions. It is elementary that arguments must be based on facts which the jury is entitled to find from the evidence and not on extraneous matters that were not or could not be received in evidence.

There was evidence that several years prior to the time of the commission of the crime for which the defendant was on trial, he had been in various hospitals, both before and after his discharge from the service in the army and that his ailment had been diagnosed:

> "Schizophrenic reaction, paranoid, manifested by ideas of reference, delusions of persecution, attitudes of hostility and aggression, derestic and autistic thinking, auditory and visual hallucinations and impaired insight and judgment incurred in a basically psychopathic personality make-up."

There was evidence from which the jury could decide he was merely what the state's experts called a "psychopathic personality" and which they testified was not insanity

to the extent he did not know right from wrong or the nature and consequences of his act (legal test for insanity which will excuse an otherwise criminal act). In arguing the insanity issue the county attorney said:

"Here is the trouble: make no mistake about it; this business of temporary insanity is the darling and the pet of criminal lawyers, especially in the big cities for some very good reason. If you are only temporarily insane, you are really in good shape. * * *

"Let this soak in: The two best psychiatrists in the state of Arizona have said that Richard Lewis Jordan is sane today. If you bring in a verdict of not guilty by reason of insanity, he can't be punished and I can't lock him up or nobody else can lock him up. He will be out on the streets and maybe down at the Club Esquire drinking beer tomorrow night. Just keep that in mind. * * *

"In this business of law-enforcement, I think Frank Eyeman and I see about as many crazy people as anyone around except in a mental institution. You see all kinds. They have almost nothing in common. Some of them think they are the sheriff and some of them think they are this and that. Some of them don't know the time of day. Some think they are persecuted. Others don't care if they are perse-cuted or not. They all have one trait in common and that is that they all think they are sane. They will tell you they are sane; they want you to know they are sane. They are just as sane as you and I and I am probably crazy. Here is the only crazy man in the history of Pima County who will come in and tell you 'I am nuts, crazy, a maniac.' If you are crazy you don't think you are crazy. That is the first symptom and sign of it. Here is the only man in the history of Pima County I know of, the only crazy man that comes in and says, 'I am nuts and a maniac; you can't do a thing to me. I had a blackout'."

These remarks concerning the defense of insanity were not legitimate argument. The jury was told that in the event they found defendant insane, there was no legal procedure for detaining him and that he would be immediately released. This was an incorrect statement. Section 44–1917, A.C.A.1939, provided that in the event a jury finds a defendant not guilty by reason of insanity at the time of the commission of the act, the court may then submit to another jury whether he is insane at the time of the verdict and, if so, he shall be committed to the state hospital for the insane. Likewise, article 3, chapter 8, 1952 Supp. and 1954 Supp.A.C.A. 1939 [A.R.S. § 36–501 et seq.], provided a complete procedure whereby the county attorney or any other person could file an

insanity proceeding and ask for commitment to the state hospital. In such event, if the evidence warranted, he could have been committed.

■ Likewise, it will be observed that the prosecutor, after purporting to qualify himself as an expert on the question of insanity by relating his varied experience with the mentally ill, proceeded to give the jury his version of what characteristics and conduct were indicative of insanity and stated in effect, that since defendant did not possess such characteristics, he was sane. Opinions concerning insanity must be put in evidence under oath and be bottomed upon the evidence which has been introduced. Neither the evidence nor the opinion based thereon can be introduced by the county attorney's argument.

The statements of the county attorney heretofore related went far beyond the bounds of legitimate argument and were prejudicial. There was injected into the jurors' minds the thought that they could possibly consider an assumed cost of one-quarter of a million dollars in determining whether the defendant should be executed; it was suggested, without a possibility of evidence for support, that a relative and other people thought he should be executed; it was unfairly represented that there was no possibility of detaining defendant in the event it found him insane at the time of the commission of the offense; and facts not proven nor supported by the evidence were given the jury to assist it in determining the case.

A most serious offense was undoubtedly committed and the facts as reflected by the evidence tend to arouse the passions of all right-thinking people. However, a defendant is entitled to a fair trial and that includes the right to receive as nearly as possible an impartial decision of the jury on the facts as proven. If passions be engendered by legitimate evidence and proper argument based thereon, it cannot be avoided; but the kindling of passions or introduction of facts through the avenue of improper argument that might improperly influence the jurors in the exercise of their judgment or discretion can and must be avoided. We do not reverse cases for mere technical errors when it appears substantial justice has been done, but the matters improperly presented to this jury in this case go beyond the pale of technical error and into the sphere of prejudicial error that deprives the defendant of the fair trial to which every defendant is entitled.

■ Complaint is made that the county attorney suggested the possibility of parole in the event life imprisonment rather than death was imposed. This has been ruled to be not improper. State v. Macias, 60 Ariz. 93, 131 P.2d 810.

■ The defendant did not testify. Counsel for the state said in effect that only God, the decedent and the defendant

could tell what happened. Defendant urges us to condemn this as a comment on the defendant's failure to testify. While these remarks were improper, no objection was made and we therefore will not consider them. Sullivan v. State, 47 Ariz. 224, 55 P.2d 312. The state cites us to the case of Cutler v. State, 15 Ariz. 343, 138 P. 1048, 1050, and contends that a bare allusion to the failure of the defendant to testify was not reversible error. There the court held that the prosecutor's remarks were corrected both by the court and the state's attorney and then announced:

"The most that can be said in favor of the appellant concerning these statements of the county attorney is that he merely alluded to the fact that the defendant had neglected to testify in his own behalf, and we think, if the statements were so made and so considered, they are not sufficient to work prejudice to appellant and cause a reversal of the judgment."

Five Texas cases are cited to support the announcement, only one of which is on point, and that one, Bruce v. State, Tex. Cr.App., 53 S.W. 867, had theretofore been overruled. Barnard v. State, 48 Tex.Cr.R. 111, 86 S.W. 760. We disapprove the foregoing statement in the Cutler case and hold that any direct statements or indirect statements that amount to an allusion that defendant failed to testify might well be reversible error.

Defendant objected to a statement of the county attorney which made reference to the defendant's conduct during the trial, as follows:

"He hasn't in this entire case from the history of it up until today shown the slightest bit of remorse or worry or concern about what he has done."

When a defendant chooses not to testify, the state is not allowed to use in argument the conduct or demeanor of defendant as evidence against him. Evidence against a defendant who chooses to refrain from testifying cannot be injected into the case by this method. Perez v. Territory, 12 Ariz. 16, 94 P. 1097. It is suggested that our case of State v. Serna, 69 Ariz. 181, 211 P.2d 455, is in conflict with the Perez case and the general rule on the subject. We do not consider the two cases in conflict. All the Serna case held was that remarks similar to those used herein did not amount to a comment on the failure of defendant to testify. Such statements do not constitute comment on failure of the defendant to testify. Norris v. State, Tex.Cr.App., 64 S.W. 1044. It was not decided in the Serna case that the prosecutor could use the conduct and demeanor of a defendant not testifying for the purpose of injecting into the case prejudicial evidence. We agree with the holding in the Perez case that the state cannot use the compelled presence of defendant at the trial as evidence to convict him when

he exercises his right not to testify. While we do not commit the court to the proposition that under some circumstances similar remarks never would be prejudicial, we do not feel these remarks were of such a character as to be prejudicial.

■ An objection was made to other remarks of the prosecutor, discussion of which we deem unnecessary. Suffice it to say that a prosecutor is allowed considerable latitude in a discussion of the evidence, the possible facts the jury may find and the reasonable inferences that may be drawn therefrom. If prosecutors will limit their remarks to the record and refrain from adding to it imaginary or assume facts having no support in the evidence, or facts which could not have been proven, much time and expense to the state, county and this court in a review of such matters could be avoided.

■ There was admitted in evidence over objection a conversation between the sheriff and the defendant in the sheriff's office while defendant was under arrest wherein it was testified the defendant admitted that he killed the decedent. There was a similar conversation in the absence of the sheriff between defendant and two deputy sheriffs wherein defendant admitted substantially the same. At the latter time the defendant signed a statement to the effect that he might have killed her. There was testimony tending to show that the statement to the sheriff and the written statement were voluntary, and hence they were both admissible in evidence.

■ There were identified some plaster casts of footprints and tire tracks at the scene of the crime which were first admitted in evidence, but before the jury examined the same, the court reversed its ruling and excluded them. We do not believe any possible prejudice was incurred by their mere identification.

The prosecutor inadvertently misstated the law as given by the court for determining the insanity of defendant. We believe this was an irregular technicality which had no possible influence on the jury. Such misstatements should be avoided and no doubt will be on a retrial of the case.

For the reasons herein stated the case must be reversed for a retrial and it is so ordered.

LA PRADE, C. J., PHELPS and STRUCKMEYER, JJ., and J. SMITH GIBBONS, Superior Court Judge, concur.

UDALL, J., having disqualified in this case, the Honorable J. SMITH GIBBONS, Judge of the Superior Court of Apache County, participated in his stead in the determination of this appeal.